May it please the Court, the President here from the Law Office, Jerry L. Sturdy, on behalf of the plaintiffs and the public. Are we ready to begin? Yes. So, Your Honors, this is a case about civic duty and the responsibilities of police officers and first responders to serve and protect. And I emphasize to the duty to protect because this is often at times opposed to this idea that the only duty of police officers is to arrest the bad guys. And specifically under these circumstances, we have somebody who was experiencing a medical emergency while she was driving, the plaintiff and appellant Robin Winger. And the police officer arrested her for DUI, for being intoxicated while driving. So there are four issues here and they are, to a large extent, they've been affected by some intervening clarifications of the law. The first one, with regard to whether the district court applied the correct standard in requiring Ms. Winger to show that the officers and first responders were specifically aware that she was suffering a stroke. That is the incorrect standard, both under the law preceding the intervening change of law in the Castro case, which I'll talk about in a second, and according to the law describing the Castro case. So the correct standard, which we argue in the district court appeal here, is that Ms. Winger would need to show that they were aware that their behaviors posed a significant... Let me find my notes here because some of this is very specific language. Under the Lemire case, she would not need to show that the officers and first responders were aware specifically of a stroke. Now, under the Castro case, which was recently decided, and it's an en banc decision, by the way, they clarified that for pretrial detainees, which Ms. Winger would fall into that category, the inquiry is purely objective. In other words, the plaintiff would not need to show subjective, deliberate indifference when it comes to... And argue that your client demonstrated material, disputed issues to demonstrate that there was a constitutional violation under the Castro's objective standard. Yes, Your Honor. Under the Castro's objective standard, which they clarified in that opinion, by the way, it would be something akin to reckless disregard. We have several facts which should have alerted these officers who were trained. One of those facts being that the officers admitted to being trained to recognize cerebrovascular accidents, CVAs, and there being seven objective symptoms of a stroke here, or a cerebrovascular accident, which they had admitted in various degrees. Those would be confusion, delirium, weakness of limbs, sagging facial muscles, poor balance, clumsiness, impaired speech, and difficulty understanding speech. Now... I thought that trained EMTs did respond to the scene, completed the evaluation, and based on the evaluation, there were no indications that she had suffered a stroke. No, that's incorrect, Your Honor. What happened was the EMT showed up, and after speaking with the officers and following some disputed events, Ms. Winger signed her name on a refusal of medical services. Right, but what did the evaluation show? I thought a trained EMT named Brady did the evaluation. Her speech was clear. She did not appear disoriented, vital signs normal, equal grip strength in both hands, and no asymmetrical drooping of the face. So I'm trying to have you identify the disputed material facts that would demonstrate objectively a reasonable officer would have known of the serious medical condition. All of those facts would be disputed with regard to the weakness of the limbs, the sagging facial muscles. We have a declaration from her daughter, who was also present, by the way, that her face was, in fact, sagging on the left side. And so that would be, I guess, a dispute as to that fact, as to her speech. So her daughter was there, right? Yes, her daughter, Annie Winger, was there. She submitted a declaration. So the record, at least, and I think just laying it out, there's the record. And my understanding is the EMT, I think it was the EMT, suggested, even though she said she was fine, the EMT suggested strongly to her that she go to the hospital, that she be transported to the hospital. And she refused. And did her daughter say, wait a minute, she needs to be taken to the hospital because she's got a drooping face? Is that in the record somewhere? Her daughter has explained that she wasn't there to hear them explain the form to Ms. Winger. No, no. Did her daughter ever say to anybody, is it in the record, that her daughter ever suggested to anyone on the scene that her mother had a drooping face, asymmetrical, and therefore needed to go to the hospital and they refused to take her? Is that in the record? With regards specifically to the drooping face, not... Well, that's your big key here. That's your genuine issue of disputed fact. The fact would be that her face was drooping and that there was some apparent drooping. As to what Annie Winger told the EMTs and the officers, no. And also with regard to the refusal of medical service, that the form is signed, that's not in dispute. But as to whether she was actually competent to refuse, that's in dispute. And especially considering Ms. Winger was giving, I'm talking about Robin Winger, she was giving responses to questions which indicated that she didn't know where she was, that she didn't know how to spell her own name. Where is that in the record? That would be in... At the scene that I'm talking about, not at the hospital. The specific quotes, I would have gotten those from the transcript of the video and audio recordings. But some of those quotes here would be when he asked her where she lived, she said, I live in right here. And that's a verbatim quote. When he asked her her name, her last name, she said, my Robin is Robin. She said, when he asked her about the time, she said, maybe 30. And when he asked her, Officer Alhemi asked her her last meal, she said, tomorrow. And when he asked her to estimate 30 seconds, she stopped him at four seconds. And I know, is it too late to ask to reserve three minutes for rebuttal? May I? Yes. I realize I should have done that earlier. And so, with regard to whether she was competent to refuse medical service, and her signature, if you look at it, it's very scribbly. It doesn't look particularly... It doesn't look like a letter of any sort. That brings in this question of whether that was a reasonable... to abate this medical emergency. Our position is that they did not. Now, Annie Winger, and forgive me, Judge, I hope this is answering your question earlier, but she was not... Well, we'll give you a lot longer time than we have to... You're down to 50 seconds. Can you indulge me in one question? Yes, Your Honor. And then, hopefully, Judge Reinhart can give you a little extra time to make up for it. The district court also ruled on qualified immunity. And your opposing counsel argued that in the brief. You didn't respond, so I'm going to ask you to spend like a minute or so trying to respond to that issue. With regard to qualified immunity, first, the district court's analysis was very short, very conclusory. It was based mostly on this idea of whether there was a violation. But, in any event, with regard to whether the law was clearly established here, there are cases that establish a duty to give medical care for pretrial detainees and for people who are imprisoned. And that duty would be clear in light of the established cases and the established law of this circuit. Now, as for a case that was exactly the same facts, to my knowledge, one doesn't exist. But I don't believe that would be enough to argue that the law is not clearly established. With all the disputed facts, I mean, if the facts were as you alleged them, and it was clear, it should have been clear, or was objectively clear, that she was suffering from a stroke and she was not a drunk or under drugs, then that would be enough, I would think, to remove any question of whether it should be known to a reasonable officer. The qualified immunity depends, to some extent, on what the facts are. That's correct. Okay, thank you. And also... We are going to come back to rebuttal, I think. Okay. Yes, Your Honor. Thank you. Good morning, Your Honors. Lois Boback for the appellees. I'd like to start by addressing... Counsel, let me say first, this is a highly fact-intensive case. And let me try some of the facts on you as to see why they don't raise a genuine issue of fact. First, of course, is the picture and the tape, whether the mugshot shows the facial droop, or whether the video shows the facial droop. Other facts, among others, she was asked her name, she replied Robin, and then said Robin, Robin, and couldn't spell her name. She said, her daughter said immediately, she doesn't feel good, there's something wrong, and then she said she doesn't feel good. Then she was asked whether she was diabetic or epileptic, and she said, I don't know, and she couldn't complete the sentence. Then she said she was just in the hospital, and when she was asked for what, she couldn't reply and said, I don't know, I don't know, I don't know, while gasping and crying. Then she obviously was confused when she said she was trying to get her daughter to work, and she was not trying to get her daughter to work, she was trying to get her daughter to school. Her speech was slurred, she couldn't spell her name. Then the officer said, why did you lie to me? And then, Robin, Robin, she said again. She said, told them she doesn't feel good. I mean, it was clear that there was something wrong with her. The question was, they did not smell any alcohol on her breath, they said. She told them that her chest hurt when they pulled her over. She told them that she'd just been in the hospital, but she didn't know why she'd been in the hospital. Then Officer Starnes, Administration of the Field Sobriety Test, said her eyes were constricted and sleepy, her speech was slurred, she was unstable, and there was no odor of alcoholic beverages on her breath. She couldn't answer the question about the time or when she ate. She was asked when she last ate, she said tomorrow. When asked how many hours she slept, she said one. She was unable to complete any of the tests, and she fell when she tried, and she couldn't... The officer gets more and more frustrated with Winger, as she's unable to understand his instructions to blow into the machine. The police officer stated that she had... her answers didn't make any sense, she had difficulty speaking. That there was something possibly internally wrong with her, the police officer said. She was physically showing me that something was wrong. Now, what happened when they gave her the form and asked her whether she wanted more medical attention is unclear. She obviously signed the form. What she understood when she signed the form, nobody really knows. She was not able to complete any tests, she didn't know how to do them. But she did complain of chest pain, and that she had been in the hospital. Annie Winger, the daughter, says, when I tried to speak with my mother about her driving, her responses to me didn't make any sense. She was slurring her words. I asked her what was wrong, she said she didn't know. I'd never seen my mother in that condition before. She said that during the mother's discussion, it was quite evident my mother was confused and wasn't responding to his questions to her appropriately. The daughter also said they began to make requests for questions again, but she wasn't able to answer their questions in a normal or coherent manner. When she was speaking to the firefighters, it was evident that my mother was confused about their questions to her. She didn't know what was going on. Her face, eye, and mouth appeared to be drooping. I don't want to interrupt, but may I respond? The daughter's deposition says her mother's face had drooped when she was pulled over. Her whole cheek was down, her lip was, too. Her eye kind of drooped, and so did her eyebrow. There's no question that she had a stroke. The question is, was it something that objectively they should have recognized, given the fact that she'd just gotten out of the hospital? Should they have recognized that that was a stroke, objectively, or that there was a good chance it was a stroke, or should they have relied on, we don't know what they said to her or what she said to them when they got her to sign a form? First of all, I... Is that enough to raise a genuine question of fact? No, it isn't, Your Honor. Okay. And if I could explain why, and I hope that the court will indulge me and give me a little bit of extra time. You'll get time. I have less than four minutes left. First of all, I don't think that the Castro standard of review applies. I think that Castro relied on Kingsley. Kingsley basically took the Fourth Amendment objective reasonableness test for a traditional Fourth Amendment use of force case and applied it to a 14th Amendment claim where a pretrial detainee was alleging an improper use of force by a corrections officer. In Castro, the court took that one step further and said that an objective standard... Okay. I don't want you to have to use your time on that, so we can give you an opportunity if you want to brief that issue. Okay. I appreciate that. I'd like that opportunity. With regard to the facts, Your Honor, no. Even if the Castro objective standard applies, then summary judgment still has to be affirmed because there were no objective factors that a reasonable police officer would have... In fact, the record demonstrates that when she went to the ER several hours later, the ER doctor initially didn't suspect a stroke. We only know that she suffered a stroke with the benefit of hindsight. When she went to the ER, the ER doctor suggested that she was suffering from drug-induced psychosis. All of the objective symptoms that she displayed were entirely consistent with intoxication of one form or another. They didn't sound alcoholic. Except that there was no alcohol. Well, but you can be intoxicated from drugs. You can be under the influence of a narcotic. So she conceded it's not alcohol. It would have to be drugs. Yes. And, in fact, she had THC in her system when the blood was tested, which is the... Arowana. Correct. And she admitted in the medical... There's one fact that's not consistent from what I know with drug-induced intoxication or psychosis, which is what the ER doctor suspected, and that's the drooping of the face through the daughter's declaration. I think the other factors articulated are consistent with DUI, and I think that's why the officers administered the FSTs. But with the drooping of the face, that's... The officers didn't know. Obviously, the officers don't know Ms. Winger the way that her daughter does. Her daughter, Annie, did not tell the police officers, look at her face. Her face is drooping. When you look at the booking photo, with the benefit of hindsight, you can look at that and say, hmm, was she suffering from a stroke? She had a little bit of... Her mouth was drooping a little bit on the left side, but her left eyebrow was higher than her right eyebrow. That's not asymmetrical drooping. When she got out of the vehicle and walked... Before the field sobriety tests were administered, she walked around the vehicle. You get this nice shot of her face. There's no obvious asymmetrical facial drooping. There's no paralysis on one side of her body. There's no weakness on either side of her body. She's not complaining about a sudden headache. Those are all of the objective standards, objective symptoms of a stroke that differ from the objective symptoms of being under the influence of something. The only symptoms that she showed that were obvious were the symptoms that were also consistent with intoxication. I disagree, Your Honor, that the booking photograph, the videos, any of those show any facial drooping. Annie Winger did say my mom's face was drooping, but that drooping is not evident in the photographs and the video evidence. And the Supreme Court has said... Well, that's a question of fact. No, the Supreme Court... I would disagree, Your Honor. The Supreme Court has said... No, sir, you can't disagree with whether somebody looking at the picture would say it's drooping or not. That's not a question of law. That's a question of fact. To you, it doesn't represent drooping. To me, it looked like drooping. You know, that's a fact. Would every reasonable police officer or EMT looking at that photo, without the benefit of hindsight, without knowing in retrospect that she had suffered from a stroke, would everybody looking at that photograph believe that she suffered a stroke? Not everybody. If it's an objective test... You know, this depends partly, of course, on what the test is. Correct. But, Your Honor, then I'd like to take the next step. Because for purposes of qualified immunity, qualified immunity applies unless every reasonable officer on the scene would have concluded that not taking Ms. Winger to the hospital would constitute a violation of her 14th Amendment right. And I would submit that, first of all, it can't be established that every... There's no evidence that every reasonable police officer who encountered Ms. Winger and saw the objective signs that were observed by the police officers  would have concluded that she suffered from a stroke. But even if they had, she exercised her constitutional right. She had a constitutional right under the 14th Amendment to refuse further medical care. She exercised that right. That could... You know, we don't know what she knew or what she was told or what she understood about signing her name to that. Well, we know that the... That was her burden on summary judgment to come forward with evidence that she didn't understand the form. She didn't come forward with any of that evidence. Is there anything in the record at all? Because I didn't see it, but maybe there is. Is there anything in the record at all that her daughter, who was there, not what her daughter said later in an affidavit or in deposition,  indicating that her mother may have suffered a stroke or was otherwise impaired, other than, you know, the symptoms that were consistent with intoxication or drug abuse? No, Your Honor, there is no evidence in the record to that effect. So she never spoke up, didn't say anything? She said, my mom doesn't feel well. Well, all right. But she didn't say, look, her face is drooping or I think she suffered a stroke or there's nothing to that effect. Or she looks different or she... Exactly. There's none of that. I thought there was some suggestion that she might have said, well, there's something internally wrong with her. She had said that she had been hospitalized for stomach problems, which would not be indicative of a stroke. No. And with regard to the chest pains, Your Honor, Ms. Winger never said she was suffering from chest pains when Officer Elhami first approached the vehicle, Ms. Winger had her hand on her chest. So Officer Elhami assumed that she was suffering from chest pains, and that's what she told the... That's what Officer Elhami told the dispatcher. But Ms. Winger never said, my chest hurts. Annie Winger never said, her chest hurts. And chest pains are not indicative of a stroke. And there was nothing that happened afterwards that would have suggested that there was a problem with her chest. With regard, I'd like to just address one more issue with regard to qualified immunity, if I may, and that is that there was no clearly established law in 2011, and I don't think there's any clearly established law now, that would have held that a police officer or an EMT violated the 14th Amendment rights of a citizen by not taking them to the hospital after that citizen exercised her 14th Amendment right to decline further medical care. That would put officers and EMTs in a catch-22 position. Which 14th Amendment right do I violate? Do I violate her 14th Amendment right to refuse medical care, or do I violate her 14th Amendment right to take her to the hospital because I think maybe she ought to be seen by a doctor? And in this case, we know that the doctors initially didn't suspect a stroke. You're saying that they would violate her 14th Amendment right if they took her to the hospital instead of imprisoning her? Against her will, yes. Instead of taking her to the jail? Yes. Arresting her? Yes. It would violate her right to take her to the hospital instead of taking her to jail and booking her and keeping her there until she could be taken to the hospital? Yes. That would violate her 14th Amendment right? Arguably, because she has a 14th Amendment right to deny medical care. She has a 14th Amendment right to say, I don't want you to take care of whatever medical condition I have. That's her right. Okay. If there are no other questions, I'll submit. Your Honors, briefly I'd like to address some of the points counsel raised. First is that Ms. Winger did explain that she had been hospitalized previously and the standard, as I said before, is that the officers would have to suspect a serious medical emergency. But that was for stomach issues. Well, as far as her putting her hand on her chest and the other objective symptoms. Did she say she had a chest pain? No, but as far as the other symptoms, which are consistent according to the post-training with a cerebrovascular accident, that would be sufficient for them to be aware of a risk of a serious medical emergency. I hope you're not suggesting that we would expect police officers, even the most diligent, to be neurosurgeons. That isn't the standard. Right, and that's not what I'm suggesting. The Supreme Court has reversed every court that's attempted to go that far to put, in terms of a qualified immunity analysis, some sort of high medical bar on police officers. That just isn't the standard. Right, I agree, Your Honor, and that's certainly not what I'm suggesting. I'm not suggesting that the officer here needed to be a neurosurgeon. I'm suggesting that in light of the training and in light of the experience. So the officer's had an EMT, who is medically trained, hopefully, and the EMT goes through all of this with her and then concludes that her symptoms are consistent with somebody who is intoxicated in some way, shape, or form. That's what they tell the officers. So the officer's supposed to overrule the EMT on the scene and say, well, okay, but all right. And in light of all of this, they then ask her, and her daughter's right there, you want to go to the hospital? We think you need to go to the hospital just to be checked. Nope, not going. There is evidence that the EMTs and firefighters believe that Ms. Winger should go to the hospital, and I believe there's some audio with the transcript. And then she refused to go. The refusal would be suspect given her capacity. The daughter's right there. And the daughter did explain that she has not seen her mother like this ever before. And to that extent, you know, when the opposing counsel is saying that she's intoxicated for one purpose, for purposes of DUI, but then, you know, she's perfectly competent to sign her name. One of the real difficulties with these cases, and this is true at the district court level, because I'm a district judge, so that's what I do, and I think it's also at the appellate level is that when we see these cases, we have the benefit of hindsight. We have the ability to look back at the record, and then our mind fills in the, you know, little crevices. The officers at the scene don't have that opportunity. Agreed. And I'm not suggesting, again, that they need to be neurosurgeons. What I am suggesting, though, is that under the objective circumstances in this case, and in light of their training and in light of what Ms. Winger said and what her daughter said, and by the way, there's an expert affidavit that we submitted as well. In light of that evidence, that creates a triable issue of fact, especially under the Castro standard now as to whether they. Even under the Castro standard, what I struggle with this case is faulting the officers for not recognizing that she was suffering from a serious medical condition that needed to be, you know, examined by a physician when trained EMTs at the scene and the emergency room doctor by the objective standard. They didn't see it. They didn't see it. And so to go back and say despite the fact that the EMTs didn't see it and the emergency room doctor didn't see it, the officers should have seen it. To be perfectly frank, Your Honor, there's some suggestion here based on these facts that there's some poisoning of the well going on, so to speak, with regards to when the officers introduce Ms. Winger to the EMTs and they say, hey, you know, she hit this car and, you know, and she kept going and things like that. And so there's a little bit of a subtext of, you know, them treating her as somebody who's been, you know, a criminal who's committed a DUI because that's based on, you know, the way that he was treating her. And you can hear this on the recording. Well, he didn't conclude, the doctor didn't conclude that she was intoxicated from alcohol. He concluded that she was suffering from some sort of narcotic or some other type of psychosis that was induced by that. I'm not suggesting that he thought she was intoxicated by alcohol. I'm suggesting that when the officers bring her in to see a medical expert and they have a chance to explain the circumstances before she says anything, that, you know, this is what happened, this is the circumstances that we encountered her in. It sort of poisons the well for them. And that's another reason why I believe we really need to rely on the objective circumstances that she exhibited in light of their training, and especially with regard to the New Castro case and the subjective state of mind. Now, the question now is whether they recklessly disregarded that possibility that she was suffering from a serious medical emergency. There's a separate state cause of action in this case, isn't there? Right. And this goes to the Garman decision, which I believe, Judge Nguyen, you were on that panel. It was unanimous. It's that the 821.6 immunity for state law claims applies exclusively to malicious prosecution. The claims that were dismissed here, not malicious prosecution, in light of the Garman decision, that ruling should be reversed. And there's no qualified immunity under state law. Correct. All the state law immunities are statutory. Any further questions? No, thank you. Thank you, Your Honors. Your Honor, before the case is submitted, I would like the opportunity to submit maybe a five-page brief on the application of Castro. Certainly. Yes. And you may also. Thank you, Your Honors. Would you please submit your briefs within seven days? We'll do that. Thank you, Your Honors. Thank you. Thank you very much. The case is adjourned. It will be submitted.
judges: Reinhardt, Nguyen, Ezra